# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

In the matter of: )

)

WETDOG, LLC, )

)

*Debtor*. )

)

**FILED**

**Lucinda B. Rauback, Clerk**
**United States Bankruptcy Court**
**Savannah, Georgia**
*By dreese at 3:28 pm, Sep 05, 2014*

Chapter 11

Case No. 13-40601-EJC

## OPINION

Since 2006, a husband and wife team have owned and operated a premier bed and breakfast located in the heart of Savannah's historic district, the Foley House Inn, through an entity named Wetdog, LLC ("Wetdog" or "Debtor"). After the 2008 recession led to a sharp decline in revenue and consequently a default on its secured obligations, Wetdog filed for bankruptcy protection to stop a pending foreclosure sale of its real estate. The Debtor now seeks confirmation of its reorganization plan over the objections of Belle Resources, Ltd. ("Belle") who holds a first-lien position on its real estate. Despite being oversecured by nearly $1 million, Belle objects primarily to the feasibility of the Debtor's plan, claiming that cash flows will be insufficient to cover necessary repairs and other expenses. Because the Court finds that the plan is feasible under § 1129(a)(11) of the Bankruptcy Code and the other confirmation requirements are met, the Court will confirm the Debtor's plan.

Before the Court is the Debtor's Second Amended Chapter 11 Plan Proposed

SAO 72A
(Rev. 8/82)

January 27, 2014 ("Plan") (dckt. 102) as amended on March 13, 2014 (dckt. 138) and Belle's

Objection to Confirmation of Second Amended Plan of Reorganization (dckt. 122). Belle

objects to confirmation on the grounds that the Plan is not feasible under § 1129(a)(11) and

violates the absolute priority rule. The Court held contested confirmation hearings on

February 26, 2014 and April 2, 2014.

I.      JURISDICTION

        This Court has jurisdiction pursuant to the following sources: sections 151,

157(a), and 1334(b) of Title 28 of the United States Code and the United States District

Court for the Southern District of Georgia's Order dated July 13, 1984, which refers all cases

under Title 11 of the United States Code to the bankruptcy judges in the district. This is a

core proceeding as defined in 28 U.S.C. § 157(b)(2)(L). Furthermore, venue is proper. *See*

28 U.S.C. §§ 1408–1409. In accordance with Rule 7052 of the Federal Rules of Bankruptcy

Procedure, I make the following Findings of Fact and Conclusions of Law.

II.     FINDINGS OF FACT

        At the February 26, 2014 and April 2, 2014 hearings, several witnesses

testified and numerous exhibits were entered into evidence. The following facts were

either proven or are the proper subject of judicial notice.[1]

---

[1] *See* Fed. R. Evid. 201; *In re Henderson*, 197 B.R. 147, 156 (Bankr. N.D. Ala. 1996).

A.   Introduction

Grant and Allisen Rogers were pursuing separate careers in New York City when they decided to start a business by purchasing a bed and breakfast located in Borrego Springs, California in 2001. (Pre-Trial Stipulation, dckt. 126, at 1.)  The Rogers acquired and operated the inn through their newly formed California limited liability company, Wetdog, LLC.  (*Id.*)  The Rogers own all of the membership interests in Wetdog.

The Rogers' California investment proved successful.  As a result, they were able to sell the inn for a substantial profit in 2006.  (*Id.*)  To postpone paying taxes on a capital gain of approximately $1 million, the Rogers, acting through Wetdog, acquired the Foley House Inn ("Foley House" or "Inn") in September 2006 and received like-kind exchange treatment under § 1031 of the Internal Revenue Code.  (*Id.*)  The Rogers paid $3.8 million for the Foley House, a nineteen-room bed and breakfast on Chippewa Square[2] in the heart of the historic district of Savannah, Georgia.  To finance this purchase, Wetdog borrowed $1,940,000.00 from Sterling Bank, $1,322,500.00 from Community National Bank, and $200,000.00 in seller financing from the Foley House on Chippewa, Inc.  (Belle Exs. 1–2, 4.)

The Foley House is located at 14 West Hull Street and 16 West Hull Street

---

[2] Chippewa Square was made famous in popular culture as the site of the bus stop scenes in the movie *Forest Gump*.

and is comprised of three structures. (Dckt. 126, at 2.)  According to Chatham County public records, the building located at 14 West Hull Street is a four-story structure built around 1896, and 16 West Hull Street is a three-story structure built around 1870 along with a two-story carriage house built or renovated in 1983. (Belle Ex. 12, at 1.)  About two years after acquiring the Inn, Wetdog began to have financial difficulties after a devastating recession caused a significant decline in its revenues. (Dckt. 126, at 2.)

Beginning around May 2012, Wetdog failed to make certain scheduled mortgage payments.  In February 2013, its first-lien holder, which was then Comerica Bank (after its merger with Sterling Bank in July 2008), initiated foreclosure proceedings on the Foley House. (Dckt. 122, at 2.)  On April 5, 2013, Wetdog responded by filing a voluntary Chapter 11 petition in this District.  The Debtor has enjoyed the rights and duties of a debtor in possession throughout this case. *See* 11 U.S.C. §§ 1107(a), 1108.

In August 2013, Belle purchased the Debtor's note from Comerica Bank. (Dckt. 47; dckt. 126, at 2.)  Due to this transfer, Belle holds a $1,882,320.14 secured claim, and the Debtor has neither objected to the claim nor characterized it as contingent, unliquidated, or disputed. (Claim 3.)

B.    Procedural History

The Debtor's Chapter 11 petition indicates that the nature of its business is "single asset real estate" as defined in 11 U.S.C. § 101(51B). (Dckt. 1.)  The petition

further designates that the Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).

On August 30, 2013, the Debtor filed its first plan of reorganization, together with its disclosure statement ("Disclosure Statement"). (Dckts. 48–49.) The Court held a hearing on October 9, 2013 to consider approval of the Disclosure Statement, to determine the secured status of parties claiming liens on property of the estate, and to determine the value of such property pursuant to 11 U.S.C. § 506. (Dckt. 50.) The Disclosure Statement was approved by the Court on October 31, 2013. (Dckt. 70.) On December 12, 2013, the Debtor amended its plan. (First Amendment to Chapter 11 Plan Proposed Aug. 30, 2013, dckt. 83.) The Court held a confirmation hearing on December 17, 2013, which was continued to February 4, 2014. Subsequently, the Debtor filed an amended plan. (Debtor's Amended Chapter 11 Plan Proposed Jan. 6, 2014, dckt. 93.)

Then, on January 27, 2014, the Debtor filed yet another amended plan, which is the Plan now under the Court's consideration. (Dckt. 102.) On February 18, 2014, the U.S. Trustee filed an objection to the Plan; however, that objection was withdrawn on April 1, 2014. (Dckts. 119, 154.) Belle filed its Objection to the Plan on February 21, 2014. (Dckt. 122.) The Court then held a confirmation hearing on February 26, 2014. Next, the Debtor amended the Plan on March 11, 2014; however, it later withdrew that amendment. (Dckt. 137.) On March 13, 2014, the Debtor amended the

Plan for the last time. (Dckt. 138.) The confirmation hearing was concluded on April 2, 2014, and the Court took the matter under advisement.

C.     The Proposed Plan and Voting

The Foley House Inn is the Debtor's principal asset, along with furnishings, fixtures, equipment, and cash on hand. For purposes of this case, the value of the Inn is $2,939,401.00. (Dckt. 48, at 10; dckt. 70.) The Plan creates the following four classes: Class 1 containing the allowed tax claims of governmental units entitled to priority under § 507(a)(8) of the Bankruptcy Code including the Chatham County Tax Commissioner's and Internal Revenue Service's claims; Class 2 containing the allowed secured claim of Belle; Class 3 containing the allowed secured claim of the U.S. Small Business Administration ("SBA");[3] and Class 4 containing all unsecured claims. (Dckt. 102, at 2–3.)

The Plan impairs all classes. Class 1 (taxes) voted to accept the Plan. (Dckt. 107.) Class 2 (Belle) voted to reject the Plan. (Dckt. 147.) Class 3 (SBA) voted to accept the Plan. (Dckt. 87.) Class 4 (unsecured claims) voted to accept the Plan. (Dckts. 92, 113, 152.)

Under the Plan, Class 1 claims will be paid in full by monthly payments of

---

[3] The SBA is successor in interest to the Debtor's note to Community National Bank.

%AO 72A
(Rev. 8/82)

$454.00 over a five-year period starting thirty days after the Plan's effective date. (Belle's Ex. 11.) Belle's secured claim in Class 2 will be paid in full by 228 monthly payments of $11,279.76[4] starting the first day of the month after the Plan becomes effective in addition to a final balloon payment due nineteen years after the first payment. (Dckt. 102, at 4.) The secured portion of the SBA's claim in Class 3 will be paid in full by monthly payments of $4,610.25[5] until the claim is satisfied. (Dckt. 102, at 6.) The Plan further provides that Class 4 claimants will receive a pro rata share of quarterly payments of $3,000.00 for five years. Additionally, on or before seven years after the Plan's effective date, these claimants will receive a pro rata share of $190,000.00. (Dckt. 138, at 1.)

D.     Objections to the Plan

The U.S. Trustee filed an objection to the Plan on the grounds that it violated the absolute priority rule and no exception applied. (Dckt. 119.) The Foley House on Chippewa, LLC holds a large unsecured claim and likewise initially rejected the Plan.[6] It changed its vote to accept the Plan because the last amendment to the Plan

---

[4] This payment amount is based on a twenty-five year amortization period at 5.25% interest.

[5] This payment amount is based on a twenty-five year amortization period at 2.25% interest.

[6] Foley House on Chippewa, LLC's claim arises from its sale of the Inn to Wetdog where it financed $200,000.00 of the purchase price. Its lien is third-in-priority with respect to the Foley House; however, the value of Belle's and the SBA's secured claims exceed the value of the Inn.

provides that the Debtor will pay an additional $190,000.00 to the unsecured class within seven years after the effective date of the Plan. (*See* dckt. 138.) After this creditor changed its vote, the U.S. Trustee withdrew its objection to confirmation because the unsecured class now accepted the Plan. As a result, the U.S. Trustee takes the position that the absolute priority rule is no longer at issue.

At the continued confirmation hearing held on April 2, 2014, only Belle's objections to the Plan remained. In its written objection, Belle contends that confirmation should be denied for three reasons: (1) the Plan lacks good faith under 11 U.S.C. § 1129(a)(3); (2) the Plan is not feasible under 11 U.S.C. § 1129(a)(11); and (3) the Plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii). (Dckt. 122.)

At the close of the confirmation hearing, Belle withdrew its § 1129(a)(3) objection. (Dckt. 122-1, at 8.) For the reasons set forth in Part III.C below, the absolute priority rule does not apply. Therefore, the sole remaining issue in this case is whether the Debtor's proposed plan of reorganization is feasible under § 1129(a)(11).

E.   <u>The Hearings on Plan Confirmation</u>

The Court conducted evidentiary hearings on plan confirmation on February 26, 2014 and April 2, 2014. The following witnesses testified for the Debtor: Allisen Rogers; Gordon Allred (hotel industry expert); Bradley Lucas (the Debtor's accountant);

and Jason Somers (contractor/expert). The following witnesses testified for Belle: Austin York (accountant/expert) and Michael Thomas (engineer/expert). The witnesses were allowed to testify out of order. Below, the Court will summarize its findings from the relevant testimony of each witness.

1. *Allisen Rogers*

The Debtor called Allisen Rogers as its first witness. Allisen holds an MBA in finance and worked for a number of years in New York's financial markets. She is responsible for keeping the Debtor's books, paying its bills, and managing its payroll. Also, she puts together the Debtor's financial statements and assists a local accounting firm in preparing the Debtor's tax returns. In addition to the Rogers, the Debtor has nine employees including one salaried assistant manager.

Most of Allisen's testimony related to the financial summaries attached to the Disclosure Statement. Based on this information, Table 1 reflects the projected cash flow available to fund the plan payments, with modest surpluses remaining.

Table 1: Disclosure Statement Projections (Monthly Averages)

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Sales | $81,988.67 | $83,700.00 | $85,485.00 |
| Total Expenses | ($61,369.00) | ($61,369.00) | ($61,369.00) |
| Cash Flow to Pay Debt | $20,619.67 | $22,331.00 | $24,116.00 |
| Debt Payment | $17,390.01 | $17,390.01 | $17,390.01 |

SAO 72A
(Rev. 8/82)

To make income projections for the Disclosure Statement, Allisen used the Debtor's historical figures, which were not seriously questioned, and added a two-percent growth rate for revenues. She did not strictly follow generally accepted accounting principles. Her projected total monthly expenses of $61,369.00 remained unchanged for the three-year period, reflecting no adjustment for inflation or pay raises for employees. Her projections for repairs were $2,000.00 per month for that same period.

Allisen testified about a $238,805.00 entry in Schedule L of the Debtor's 2011 tax return that Belle alleged represents capital improvements that should have been included as part of the Debtor's budget. In response to a discovery request, Allisen prepared a list of asset purchases, which totaled much less. She suggested that the $238,805.00 entry may have something to do with writing off bad debt from the like-kind exchange transaction used to sell the California inn and purchase the Foley House.[7] Allisen's testimony was credible in all respects.

### 2. Gordon Allred

Next, the Debtor called Gordon Allred as an expert in the hotel industry to provide evidence that the Debtor's revenues would likely increase in the foreseeable future based on industry trends and the ongoing economic recovery as a whole. Allred is the First Vice President and Senior Director of the National Hospitality Group for the

---

[7] Allisen's inference was correct as Bradley Lucas's testimony later revealed.

firm Marcus & Millichap where he has worked for twenty-one years. Allred specializes in helping clients buy and sell hotels around the country. (Hr'g Tr. Feb. 26, 2014, dckt. 142, at 10.) He acted as the broker in the Debtor's acquisition of the California inn. Although the extent to which he had specialized knowledge about bed and breakfasts specifically was uncertain, he clearly had substantial experience in the hotel industry generally. Allred was qualified as an expert on the trends in the hotel industry and market. (Dckt. 142, at 27.) Allred characterized the Foley House as a boutique inn, in contrast to a bed and breakfast, because its revenues were sufficient to allow additional staff to be employed besides the typical husband and wife team of most bed and breakfasts. (Dckt. 142, at 15.)

Allred testified that people in his field rely on Smith Travel Research, which is a third-party reporting agency that collects data voluntarily submitted by hotels around the country. He also consults the AAA rating data, as well as online services such as TripAdvisor. Allred testified that 2008 represented a catastrophic year for the industry, but that the trends in recent years were much improved:

> The Savannah market for hotels bottomed out forty to forty-two months ago and has been increasing steadily since then. So in other words, occupancy has been increasing in Savannah at about ten percent per year occupancy growth for the past forty plus months. And ADRs (average daily rates of hotels) have been increasing for the past forty months as well as RevPar, which is a combination of occupancy and ADR. . . . [T]he average in the country right now is about a six percent growth in revenue annually. And, that's taking into account every market across the country, including some markets that are still declining from the recession. But you take a national average, and the growth is about six percent. And Smith Travel reports that

for the foreseeable future, three to five years out, we should continue about the same rate.

(Dckt. 142, at 30–32.)

The Court finds Allred's testimony credible and that his projections demonstrate how conservative both Allisen Rogers and Austin York were in using projected growth rates of only two percent.  If the revenue projections were closer to six percent, feasibility of the Plan would be less debatable.

3.    *Austin York*

On the issue of feasibility, the Debtor's financial projections were of course the focus of the greatest attention by both parties.  Belle called Austin York as an expert witness.  York is a Certified Public Accountant and Certified Financial Planner with Dabs, Hickman, Hill, and Cannon in Savannah, Georgia.  York also spent two years after college working for the international accounting firm KPMG, LLP.  York was retained by Belle to review the Debtor's financial records and projections for the three-year period after confirmation reflected in the Disclosure Statement.  York undertook to create his *own* projections by using some of the Debtor's figures and making various adjustments along the way.  In other words, he started from scratch so that he could make his own calculations.  York did a much better job of analyzing expense categories, accounting for inflation, and otherwise cleaning up the Debtor's calculations.  For example, York added as an expense line item a payroll service fee of $46.00 per month.  He also tied utility

expenses to the growth in sales and factored in the same increases. Perhaps most importantly, York added a line item for distributions that the Debtor will likely need to make to the owners to pay the personal taxes they will owe on the projected taxable income generated by the business. *See infra* Table 2.

It is important to note that York's financial analysis of the Debtor's projected expenses and net cash flow were greatly influenced by the substantial repairs to the three buildings comprising the Foley House Inn that Belle's engineering expert, Michael Thomas, advised must be made in the coming months and years. As discussed later in this opinion, Thomas prepared a report that provides a wide range of cost estimates ($230,000.00 to $500,000.00) for the various repairs he found would need to be made to the Foley House. (Belle Ex. 12.) He labeled one group of repairs "Immediate Attention Items" and the other "Longer Term Maintenance Items." (*Id.*) York adopted these estimates for purposes of preparing his projected expenses. In other words, York built these repair estimates provided by Thomas back into the projected cash flows. Because Thomas presented ranges of repair estimates, York prepared three scenarios corresponding to low, middle, and high repair cost estimates. Scenario 1 uses the lowest cost estimates from Thomas's report; Scenario 2 uses costs from the middle of the range provided; and Scenario 3 uses the highest cost estimates for each category of expenses.

York's report sets forth these three sets of projections that differed only

with respect to the amount of the projected costs associated with making the repairs recommended by Thomas.  Because York's Scenario 1, based on the lower end of Thomas's repair estimates, actually supports a finding that the plan is feasible, the Court will focus on those projections. *See infra* Table 2.

Table 2: York's Scenario 1 (Low Range of Repair Costs)

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Sales (at 2% Growth) | $1,159,740 | $1,182,935 | $1,206,594 |
| Operating Expenses[8] | $907,372 | $844,307 | $847,046 |
| Distributions for Taxes | ($24,528) | ($40,308) | ($46,620) |
| Cash Flow to Pay Debt | $227,840 | $298,320 | $312,928 |
| Less: Debt Payments |  |  |  |
| Chatham County | ($4,540) | ($5,448) | ($5,448) |
| Belle | ($112,798) | ($135,357) | ($135,357) |
| SBA | ($46,103) | ($55,323) | ($55,323) |
| Unsecured Creditors | ($10,000) | ($12,000) | ($12,000) |
| Total Debt Payment: | $173,440 | $208,128 | $208,128 |
| Net Annual Cash Flow After Debt Payments | $54,400 | $90,192 | $104,800 |

While the Court's summary of Scenario 1 set forth in Table 2 reflects *annual* figures for simplicity, York's analysis and testimony revealed that in some months there will be insufficient cash flow to make the scheduled debt payments. But, these shortfalls do not

___

[8] York's Scenario 1, reflecting the low range of repair costs, called for monthly expenditures for short-term repairs of $6,600 for 2014 (or $79,200 for the ten-month period of March through December 2014). Beginning in January 2015, these short-term expenditures are replaced by long-term repair expenses budgeted at $2,167 per month, for a total of $52,008 for the twenty-four month period ending December 31, 2016. Scenario 1 thus contemplates total repairs to be funded in the amount of $131,208 over three years (or ten times the amount projected by the Debtor's expert Jason Somers).

take into account cash on hand of $63,956.66 as of April 1, 2014, which would more than cover the required disbursements. (Dckt. 158, at 3.) Further, if York had adopted a six-percent growth in revenue figure as Allred suggested would be appropriate, his Scenario 1 would provide even greater support for feasibility.

York's testimony was credible in every respect, but the Court finds that he misinterpreted the Schedule L change in basis of $238,805.00 in the Debtor's 2011 Form 1120S. This misinterpretation caused him to include a significant expense ($33,333.00 per year) in his projections for capital improvements that may be substantially overstated. On the other hand, he was not aware of the additional $190,000.00 that the Plan, as amended, proposes to be paid to unsecured creditors after seven years when he made his projections.

York's report concludes with opinions that correspond to his treatment of Thomas's repair estimates:

In our opinion based on the projections calculated at **CPA Projection Scenario 1**, the Debtor appears to have the cash flow ability to make loan payments to creditors as listed in the proposed plan for years 2014 through 2016. Year-to-date projected totals for each of the 3 years indicate positive cash flow after servicing debt.

In our opinion based on the projections calculated at **CPA Projection Scenario 2**, the Debtor does not appear to have sufficient cash flow ability to make loan payments to creditors during 2014. Year-to-date projected totals for 2014 indicates[sic] negative cash flow after servicing debt. Years 2015 through 2016 indicate positive cash flow after servicing debt.

> In our opinion based on the projections calculated at **CPA Projection Scenario 3**, the Debtor does not appear to have sufficient cash flow ability to make loan payments to creditors during 2014. Year-to-date totals for 2014 indicates[sic] negative cash flow after servicing debt. Years 2015 through 2016 indicate positive cash flow after servicing debt.

(Belle's Ex. 11, at 3 (emphasis in original).) York's projections support a finding of plan feasibility, at least with respect to Scenario 1.

4.     *Bradley Lucas*

When the confirmation hearing resumed on April 2, 2014, the Debtor called its accountant, Bradley Lucas, as a fact witness largely to answer the mystery of the $238,805.00 change in basis that appeared in the 2011 tax return. Lucas explained that part of the original sales price from the sale of the California inn was a note from the buyers of the property. Those buyers subsequently defaulted, and it appeared in 2011 that the note was uncollectible. Accordingly, Lucas made an adjustment to the Debtor's tax basis in the Foley House as follows:

Table 3: Change in Asset Basis Caused by Default on Seller-Financed Debt from Like-Kind Exchange

|  | As Originally Recorded | Bad Debt on Seller Financing | After Recognizing Bad Debt Loss |
|---|---|---|---|
| Sales Price of Assets Sold | $3,000,000 | ($200,000) | $2,800,000 |
| Basis of Assets Sold | ($2,000,000) |  | ($2,000,000) |
| Gain (Deferred by Like-Kind Exchange) | $1,000,000 | ($200,000) | $800,000 |
|  |  |  |  |
| Purchase Price of New Assets Purchased | $4,000,000 |  | $4,000,000 |
| Gain Deferred from Like-Exchange | ($1,000,000) |  | ($800,000) |
| Adjusted Basis of New Assets | $3,000,000 |  | $3,200,000 |

(Debtor's Ex. 12.) Belle's counsel conceded in closing argument that Belle has no grounds to refute this explanation, so the Court has taken that into consideration in evaluating York's projections. By decreasing the capital improvements figure in York's three scenarios, the Debtor's projected cash flow increases.

### 5.  *Michael Thomas*

As reflected in the testimony and calculations of York, Belle's main argument regarding the Plan's feasibility is the alleged failure of the Plan to adequately allocate funding for necessary repairs to the Inn. As observed previously, York's financial analysis adopted the repair estimates of Belle's engineer, Michael Thomas. Called as an expert witness, Thomas testified that on January 21, 2014, he spent a little more than one hour inspecting and photographing various areas of the Foley House that concerned him. A few days later, he prepared a written report containing seventy-five

photographs, recommendations for repairs to be made in the near term (within twelve months), and recommendations to be made over a longer period. He estimated that it would cost $230,000.00 to $500,000.00 to make his recommended repairs.

Although it is clear that Thomas is well-qualified by education and experience to testify about such matters, the Court is troubled by two things. First, because his inspection lasted only one hour and he took no measurements, his cost estimates for repairs were not particularly enlightening. For example, he estimated that it would cost $10,000.00 to $100,000.00 to replace a beam in the basement of the carriage house, but he gave no details about what materials or labor would be required for that project. Secondly, Thomas speculated about the condition of the Inn. For example, he found evidence of leaks from the roof both in the attic and in the lower floors. Yet, he was unable to determine whether the leaks were active. Thomas also testified that cracks in the brick walls could be allowing water to leak through the wall, leading to the continuous deterioration of the wooden structures inside, but he was unable to confirm this was happening because of the thickness of the walls. Testimony that the exterior brick walls were two or three courses thick makes it difficult to give this concern much weight. The Court was left to speculate about the existence and extent of moisture issues.

6.    *Jason Somers*

To counter Thomas's report and testimony, the Debtor offered the report

and testimony of its own expert, Jason Somers, whose analysis of the condition of the Debtor's buildings reflected a more practical approach based on his experience as a contractor. (Dckt. 146.) Somers's report listed what needed to be fixed, indicating no cost for repairs that the owners could make (e.g., removing a pile of debris from the roof that looked like it could fit in a trash can). He estimated that it would cost $15,412.00 to $16,912.00 to make all necessary repairs. (Dckt. 165-2.)

The divergent approaches taken by Thomas and Somers in assessing what repairs were necessary represent two ends of a spectrum. One example demonstrates this difference. In the Foley House's courtyard, Thomas and Somers both discovered an area where the brick pavers were sunk down in a small area. Thomas testified that this condition might be caused by a sinkhole or an exposed sewer line that was washing away the dirt, two scenarios that could represent enormous structural or foundational problems. Somers, on the other hand, guessed that a decomposing root (from a tree that was cut down long ago) could be creating a cavity that is causing the bricks to sink. Thomas estimated that it would cost $2,000.00 to $25,000.00 to fix the sunken paver condition. In contrast, Sommers estimated that it would cost $2,500.00 to $4,000.00.

It was a strategic choice for the objecting creditor to use an expert who would emphasize the need for safety, erring on the side of caution and recommending that *exploratory* work be performed to determine the extent of problems that were not readily

apparent from a visual inspection. Time will tell, but these two approaches reflect an exacting (and expensive) analysis of needed repairs versus a more practical view of the needed repairs. The correct measure of necessary repairs that should be incorporated into the projections lies somewhere between these two extremes. By focusing on York's Scenario 1, which incorporates Thomas's lower range of repair estimates, the Court finds that these projected repairs will still support feasibility.

F.   Debtor's Monthly Operating Reports

By agreement of the parties, the Court has taken notice of the actual receipts figures reported in the Debtor's monthly operating reports since March 2014. These figures compare favorably to the projections of both Allisen Rogers and Austin York.

Table 4: Revenue Projections Compared to Actual Sales

|  | March 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Total Revenue: March–July |
|---|---|---|---|---|---|---|
| Allisen's Projections | $107,100 | $122,400 | $102,000.00 | $80,580 | $71,400 | $483,480 |
| York's Projections | $126,245 | $144,280 | $120,234 | $94,985 | $84,163 | $569,907 |
| MOR Receipts | $143,189 | $133,407 | $115,529 | $109,045 | $105,542 | $606,711 |

In short, the Debtor's revenues are outpacing projections. (Monthly Operating Reports, dckts. 157–59, 164, 179.)

III.    CONCLUSIONS OF LAW

A.    Feasibility of the Plan

Section 1129 of the Bankruptcy Code provides a list of requirements that a court must find to confirm a Chapter 11 plan. 11 U.S.C. § 1129(a). One of these requirements is commonly referred to as feasibility. More specifically, the statutory standard for feasibility is that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

Courts have interpreted this statutory standard to mean that a plan proponent, which is the Debtor in this case, has the burden to prove that the proposed plan has a reasonable prospect of success and is workable. *In re Chapin Revenue Cycle Mgmt., LLC*, 343 B.R. 722, 725 (Bankr. M.D. Fla. 2006); *see also United States v. Haas (In re Haas)*, 162 F.3d 1087, 1090 (11th Cir. 1998). To make this determination, courts often consider the following factors: (1) the earning power of the business; (2) its capital structure; (3) the economic conditions of the business; (4) the continuation of present management; (5) the efficiency of management in control of the business after confirmation; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *E.g., In re Chapin*, 343 B.R. at 725; *In re 222 Liberty Assocs.*, 108 B.R. 971, 986 (Bankr.

E.D. Pa. 1990).

Chapter 11 of the Bankruptcy Code does not require a plan proponent to prove that a plan is guaranteed to succeed. Instead, the proponent must show that the plan has a "reasonable assurance of commercial viability." *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 318 (Bankr. N.D. Ill. 2008) (internal quotation marks omitted). Stated differently, the feasibility requirement involves "a finding of reasonable probability of actual performance of the plan." *In re Oaks Partners, Ltd.*, 141 B.R. 453, 458 (Bankr. N.D. Ga. 1992).

Based on the Court's careful consideration of all of the testimony and other evidence presented, I conclude that the Debtor has met its burden of proof that the Plan has a reasonable prospect of success and is workable. Therefore, I find that the Plan complies with § 1129(a)(11). Below, I will address each factor relevant to the feasibility determination in turn.

1.   *The Debtor's Earning Power*

As required by Rule 2015 of the Federal Rules of Bankruptcy Procedure, the Debtor has submitted monthly operating reports. *See* Fed. R. Bankr. P. 2015(b). As shown in Table 4 above, the Debtor's actual revenues for March 2014 through July 2014 have exceeded the projections that it made in the Plan by $123,231.34. (Dckt. 179, at 3.)

Also, Allisen gave detailed testimony about the historical income of Wetdog, which explained the seasonal variation in the Debtor's business, and showed a recent trend of revenue growth. The Court's analysis of the Debtor's earning power takes into account the fairly simple business model of a bed and breakfast. The Foley House is located in center of an extremely popular tourist destination, the historic district of Savannah, Georgia. As long as the condition and appearance of the Inn is maintained to the satisfaction of the rating agencies and advertising is adequate, at least the revenue side of earnings is virtually automatic. Accordingly, the Court finds that the earning power of the Debtor weighs in favor of finding that the Plan is feasible. *Cf. In re HSD Partners, LLC*, No. 10-40295, 2011 WL 7268051, at *3 (Bankr. S.D. Ga. Sept. 12, 2011) (Davis, J.) (finding that a plan was not feasible where the debtor's actual sales were below projections).

2.    *The Debtor's Capital Structure*

As Belle points out in the parties' joint pretrial stipulation, the Debtor does not have any measurable equity in the Foley House based on the $2,939,401.00 value set in the Disclosure Statement in relation to the claims secured by the Inn. (Dckt. 126, at 5.) Also, the Rogers have filed a joint Chapter 13 case. Therefore, the Debtor's access to additional capital is likely to be extremely limited. On the other hand, the Debtor had at least $45,000.00 in its bank accounts at the time of the April 2, 2014 hearing. Overall, this factor does not weigh in favor of feasibility. But, the Debtor's situation is not

⬣AO 72A
(Rev. 8/82)

unusual for a debtor that has no equity in its principal asset.

3.      *Economic Conditions Affecting the Debtor*

As described elsewhere in this opinion, the recession that began in 2008 appears to be the major cause of the Debtor's decline in revenues. The only evidence of future market conditions, which are by definition somewhat speculative, came from the uncontradicted testimony of Allred regarding the anticipated six-percent growth in hotel revenues over the next three to five years. This figure is very significant because both the Debtor's projections and those of York were based on the much more conservative growth rate of two percent. Therefore, this factor supports the Court's finding that the Plan is feasible.

4.      *The Continuation of the Debtor's Management*

Under the Plan, the Rogers will continue in their respective roles at the Foley House. This operation is currently their only source of income, and the successful reorganization of the Debtor is the only way for them to recoup their life savings that they have poured into the business. The Court has been presented with no evidence that the Rogers' dedication to the Debtor will falter during the life of the Plan. This factor weighs in favor of feasibility.

5.    *The Efficiency of the Debtor's Management Postconfirmation*

Despite the Debtor's financial difficulties, the Rogers' management of the Foley House appears to be competent and reasonable.  They are both sophisticated businesspersons dedicated to the success of this venture, and they have proven their ability to manage the Inn while participating in this case as well as their personal bankruptcy case.  Like the last factor analyzed, this factor weighs in favor of finding that the Plan is feasible.

6.    *Other Considerations Affecting Plan Feasibility*

The core of Belle's feasibility argument, as a factual matter, can be summarized as follows: the Debtor will need to make substantial repairs over the next few years; the Debtor does not have an adequate cash reserve to fund these repairs; and the Debtor's income will not be sufficient to cover the cost of these repairs. (*See* dckt. 122, at 8–9.)

To begin, the Debtor is exceeding its financial projections and reports that it has substantial cash reserves in its accounts.  Even if the Court assumed that the repairs recommended by Thomas will be necessary within the next few years and will cost within the ranges that he identified, York's report, which uses financial projections that have already been proved overly conservative, shows that the Debtor will have positive cash flow for the next few years unless the worst case scenario from Thomas's report happens.

Belle misunderstands the standard for feasibility. The Debtor is not required to show that there is a 100% chance that the Plan will succeed. Instead, the Debtor is only required to show the Plan has a "reasonable prospect of success," and the Debtor has met its burden in that regard. *In re Chapin*, 343 B.R. at 725.

To find otherwise, the Court would be imposing an extraordinary duty on the Debtor that is simply not mandated by the Code. Belle is an oversecured creditor with about $1 million of value protecting its interest in the Foley House, and the Court is not aware of any obligation on the Debtor, inside or outside of bankruptcy, to restore every inch of this historic property to a pristine, new-construction-like condition. Furthermore, the fact that the Foley House continues to receive high ratings and attract customers refutes Belle's assertion that the Inn is in disrepair in the first instance.

Based on a review of all of these factors, the Court finds that the Debtor has amply met its burden under § 1129(a)(11).

B.    Other Section 1129(a) Requirements

The Court finds that all of the other requirements in § 1129(a), including the requirement that the Plan has been proposed in good faith, have been met except § 1129(a)(8). That provision is not met because the class containing only Belle's secured claim is impaired under the Plan, and Belle voted to reject the Plan. Therefore, the Plan

must satisfy the requirements of § 1129(b)—commonly referred to as the cramdown provisions—to be confirmable. *See* 11 U.S.C. § 1129(b).

## C.     Cramdown Requirements

Despite failing to satisfy § 1129(a)(8), the Plan may still be confirmed if it does not discriminate unfairly and is fair and equitable with respect to each impaired class that votes to reject it. 11 U.S.C. § 1129(b)(1); *In re Chapin*, 343 B.R. at 726. Importantly, the requirements of § 1129(b) only apply to a *class* and only to a class that is both impaired and votes to reject the plan. Dissenting creditors within a class that casts an affirmative vote for reorganization are afforded no additional protections by § 1129(b).

The class containing solely Belle's secured claim is the only impaired class that has not accepted the Plan.  Section 1129(b)(2)(A) provides a non-exhaustive list of what it means for a plan to be fair and equitable with respect to a class of secured claims. The Court finds that the Plan's treatment of Belle's claim complies with that provision and that the Plan does not discriminate unfairly with respect to Belle's claim. Belle does not argue otherwise in its objection to the Plan. (*See* dckt. 122, at 9–14.)

Instead, Belle argues that the Plan violates the absolute priority rule and that the Rogers $25,000.00 personal contribution to pay the Debtor's tax obligations is insufficient to satisfy the elements of the new value exception.  This argument is

completely without merit. The statutory source of the absolute priority rule is contained in § 1129(b)(2)(B), which provides a non-exhaustive list of what it means to be fair and equitable with respect to a class of unsecured claims that does *not* accept a proposed plan. The only class of unsecured claims in this case voted to accept the Plan. Therefore, the fair and equitable requirement of § 1129(b) does not apply to that class and the absolute priority rule of § 1129(b)(2)(B)(ii) is not implicated by extension. *See In re Adelphia Commc'ns Corp.*, 544 F.3d 420, 426 (2d Cir. 2008) (noting that a plan does not need to satisfy the absolute priority rule with respect to an impaired class that votes to accept the plan). The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.

Dated in Savannah, this 5th day of September, 2014.

Edward J. Coleman, III
United States Bankruptcy Judge
Southern District of Georgia